**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-4512**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KEVIN DAMON WILLIAMS,

Defendant - Appellant.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, District Judge.  (3:22-cr-00247-KDB-DCK-1)

———————

Argued:  March 18, 2026                                       Decided:  July 7, 2026

———————

Before THACKER, RUSHING, and BENJAMIN, Circuit Judges.

———————

Reversed, vacated, and remanded by published opinion.  Judge Benjamin wrote the opinion, in which Judge Thacker joined.  Judge Rushing wrote a dissenting opinion.

———————

**ARGUED:**  Ashley Ali Askari, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Julia Kay Wood, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  John G. Baker, Federal Public Defender, Ann L. Hester, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Russ Ferguson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

———————

DeANDREA GIST BENJAMIN, Circuit Judge:

This case arises from an encounter between police officers and a man seated in a parked car. It raises two questions under the Fourth Amendment: whether that encounter was a seizure and, if so, whether the seizure was justified by reasonable suspicion of criminal activity. For the following reasons, we hold that a seizure occurred and that it was not supported by reasonable suspicion.

I.

A.

The encounter took place on a roadway and in an adjacent parking area within an apartment complex. The roadway allows cars to travel in both directions. The parking area lines one side of the roadway with the parking spaces set at right angles to the road. Each parking space extends directly from the pavement edge so that parked vehicles sit perpendicular to the flow of traffic.

Kevin Williams and two of his friends were seated in a white Mercedes E-class sedan in one of these parking spaces near the pool area of the apartment complex. The car was backed into a parking space between two other cars.

While the group was in the vehicle, a 911 operator received a call reporting a White Mercedes parked in the pool area of the apartment complex parking lot with multiple subjects inside, including a light-brown-skinned male with either dreads or twists, possibly selling or possessing narcotics. The caller, who stated he lived in the neighborhood, wished to remain anonymous and therefore did not provide his number or name.

2

The 911 operator notified police in the area through a written report on patrolling officers' computer aided dispatch ("CAD") systems.[1] The CAD report showed the caller's phone number and instructed the officers in department shorthand to "CHECK FOR" "BRO SKINNED, LT SKINNED, MALE WITH BRAIDS" "SITTING IN WHI MERZ SEDAN" "SAME APPEARS TO BE MAKING DRUG TRANSACTIONS" "CURRENTLY NEAR THE POOL AREA." J.A. 59.[2] The CAD report further showed the priority status of the call as "Priority Normal" and noted that "NO WPNS SEEN." J.A. 59.

Officers Pistone and Wilson received the CAD report and proceeded to the apartment complex in response. They arrived in two separate marked police vehicles and drove down the apartment complex roadway at normal speeds, without lights or sirens.

As the officers approached the pool area, they suddenly and simultaneously stopped at the sight of Williams and the white Mercedes sedan. Pistone stopped in the middle of the roadway, perpendicular to and partially in front of Williams' car. Pistone's car was approximately 15 feet in front of Williams' car. Wilson stopped a few yards behind Pistone.

---

[1] CAD systems are used by police departments to process calls and identify who to dispatch. The systems allow 911 operators to send information from emergency calls directly to the screen of police officers' cars.

[2] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers for citations to the J.A. utilize the "JA#" numbering at the bottom of the page on each document.

3



**Middle:** Williams' white Mercedes.  **Right foreground:** Wilson's police vehicle.  **Right background:** Pistone's police vehicle.



**Left:** Williams' white Mercedes.  **Foreground:** Wilson's police vehicle.  **Background:** Pistone's police vehicle.



**Left:** White vehicle parked next to Williams' Mercedes.  **Background:** Pistone's police vehicle.  **Foreground:** Williams' white Mercedes.



**Left:** Pistone's police vehicle.  **Right:** Wilson's police vehicle.

After stopping, the officers exited their vehicles and immediately smelled the odor of marijuana.  They then approached the vehicle and made contact with Williams and the

5

other occupants.  When asked about the odor, Williams admitted that he and the others had smoked the marijuana.  Based on the odor and Williams' admission, Pistone directed all occupants to exit the vehicle so that the officers could conduct a search.  Pistone detained Williams and placed him in the back of his police vehicles while Wilson attended to the remaining occupants.

While Williams was being detained and placed in the back of a police vehicle, a black Ford Fiesta, which had no relation to Williams, exited the apartment complex.  The black Ford Fiesta was parked a few spaces away from Williams' Mercedes and was not parked immediately between two other cars.  To exit, it pulled out of its parking space and drove by Wilson's patrol vehicle.



**Background:** Black Ford Fiesta exiting a nearby parking space.

After Williams and the other occupants were secured, the officers searched Williams' Merecedes and discovered a handgun between the driver's seat and the center console. When Pistone questioned Williams about the gun, Williams admitted it was his and that he had purchased it from a friend.

### B.

Based on a prior felony conviction for domestic violence, Williams was charged with possessing a firearm as a convicted felon under 18 U.S.C. § 922(g)(1). He pled not guilty.

Williams moved to suppress evidence obtained during the search of his car, arguing that the officers violated his Fourth Amendment rights when they stopped their vehicles in front of him. To Williams, the officers, at that moment, seized him without reasonable suspicion.

The district court held a hearing on Williams' motion to suppress and heard testimony from Pistone. Pistone described the area as a "very high violent-crime and drug sale/possession area" and testified that he had previously responded to calls for service in the area. J.A. 120. Pistone admitted that he had not listened to the 911 call when he responded to the call for service and had only viewed the written information in the CAD system. *Id.* Pistone further testified that he intended to "look for the vehicle" and "make voluntary contact" to speak with the occupants about why they were in the parking lot. J.A. 120–21. Voluntary contact meant that Pistone would approach the vehicle like he "would approach anyone else on the street, voluntary, no seizure or detention committed." J.A. 121.

7

Pistone further commented that he would have let Williams leave before he opened his door and smelled the odor of marijuana:

> **Q [from counsel]:** Before you opened the door, as you parked your vehicle, if Mr. Wilson – if Mr. Williams had started his vehicle and tried to pull out, would you have let him leave?
>
> **A [from Pistone]:** Yes sir, he would have been free to leave.
>
> **Q:** You would have just let him drive away?
>
> **A:** Yes, sir.

J.A. 143.

After hearing this testimony, watching the officers' body-worn camera videos, and considering the parties' arguments, the district court denied Williams' motion to suppress, finding that Williams was not seized when the officers first stopped their cars. On that point, the court found that there was room for Williams to drive out, both to the left and to the right. The court also found that a reasonable person in Williams' position would have felt free to leave, even considering the position of the police vehicles.

The district court then found that the encounter became "something else when [the officers] smelled burnt marijuana." J.A. 171. The court concluded that the smell of marijuana, the 911 call, and the corroboration of the details in the phone call provided reasonable suspicion to seize Williams by walking up to the car. The district court also concluded that those same facts provided probable cause to support the search of the vehicle.

8

Williams then proceeded to a bench trial, where the Government introduced evidence of the gun found during the search. The district court found Williams guilty of possessing a firearm as a convicted felon.

Williams now appeals the district court's denial of his motion to suppress. Williams argues that he was seized when the officers stopped their cars in the roadway because a reasonable person in Williams' position would not have felt free to leave. Williams further argues that the officers lacked reasonable suspicion to justify such a seizure.

We have jurisdiction to review the appeal pursuant to 28 U.S.C. § 1291.

## II.

On appeal from a denial of a motion to suppress, we review a district court's legal conclusions de novo and its factual findings for clear error, construing the facts in the government's favor. *United States v. Brinkley*, 980 F.3d 377, 383 (4th Cir. 2020). The reasonable person standard " 'is an objective one,' thus 'its proper application is a question of law' " that we review de novo. *United States v Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002)).

## III.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. AMEND IV. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *See Florida v. Bostick*, 501 U.S. 429, 434 (1991). "So long as a reasonable

9

person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Id.* (internal citation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

For such a seizure to be constitutional, it must be supported by an officer's reasonable, articulable suspicion of criminal activity. *See Bostick*, 501 U.S. at 434.

Accordingly, two questions emerge in this case. First, did a seizure occur when the officers stopped their police vehicles in the roadway? Second, if a seizure occurred, did the officers have reasonable suspicion to justify the seizure?

### A.

We start with the first question: whether the officers seized Williams the moment they stopped their police vehicles in the apartment complex roadway.

As stated above, a seizure occurs only when an officer, by either physical force or show of authority, has restrained a person's liberty. *Terry*, 392 U.S. at 19 n.16. In assessing whether a particular encounter constitutes a seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. In other words, a seizure occurs when the totality of the circumstances surrounding the encounter would lead a reasonable person to believe that he was not free to leave. *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012).

10

Courts consider several factors in determining whether the circumstances surrounding the encounter would lead a reasonable person to believe that he was not free to leave. These include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they sought to block his departure or restrain his movement, whether the officers' questioning was nonthreatening, and whether they treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature." *United States v. Gray*, 883 F.2d 320, 322–23 (4th Cir. 1989) (emphasis added & citation omitted).

Whether a suspect's vehicle has been "blocked in" by a police vehicle is important for our seizure analysis. *See Jones*, 678 F.3d 293, 299–302 (4th Cir. 2012) ("When an officer blocks a defendant's car from leaving the scene . . . the officer demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation."). A vehicle may be considered blocked in even if it is not completely constrained. *See, e.g.*, *id.* at 301 n.4. This is the case where a reasonable person would not feel free to attempt the available means to exit. *See id.* By contrast, if it is "readily apparent" that there is "more than enough room" to drive away without any "special maneuvering," then a person has not been blocked in. *United States v. Watkins*, 816 F. App'x 821, 827–28 (4th Cir. 2020).

In *Jones*, this court found that the defendant was blocked in even though he could have physically maneuvered his car to exit. *Jones*, 678 F.3d at 305. There, a police officer followed the defendant into a private apartment complex and stopped his police vehicle in

11

the one-way lane of traffic behind the row of diagonal parking spaces that the defendant had just pulled into. *Id.* at 296–97. The police officer stopped in the roadway (i.e., the lane of traffic) instead of pulling into one of the diagonal parking spaces to ensure that he would have the opportunity to contact the occupants of the vehicle. *Id.* at 297. Even with the police officer in that position, the defendant could have backed his car out of the parking lot and exited the apartment complex going the wrong way on the one-lane driveway. *Id.* at 301 n.4. Despite his physical ability to leave, the court still concluded that the defendant was "blocked in" by reasoning that "no reasonable law-abiding person would take such evasive action in the presence of police officers." *Id.*

In *Watkins*, this court held that the totality of circumstances did not indicate that the defendants were seized, largely based on the defendants' ability to maneuver their vehicle. *Watkins*, 816 F. App'x at 828.[3] There, a police officer observed a truck parked in the rear of a hotel parking lot and suspected the individuals in the truck might be using drugs. *Id.* at 823. Deciding to investigate further, the officer drove into the hotel parking lot and parked his vehicle in the driving lane on the opposite side of the truck, three parking spaces away from where the defendants were parked. *Id.* To exit their parking space, the defendants would have had to back up and turn the rear of the truck away from the police vehicle. *Id.* "In other words, the [police vehicle] was not even in the direction that would

---

[3] The Government primarily relies on *Watkins* to support its argument that Williams was not seized. *Watkins* is an unpublished opinion. In our circuit, unpublished opinions "ha[ve] 'no precedential value' and [are] 'entitled only to the weight' generated 'by the persuasiveness of [their] reasoning.' " *Koontz v. SN Servicing Corp.*, 133 F.4th 320, 327 (4th Cir. 2025) (quoting *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006)).

12

stop the truck from being able to get out of the parking spot." *Id.* at 827. To exit the parking lot, the defendants would have had to drive the truck past the parked police vehicle where there was "more than enough room." *Id.* at 827–28. The court determined that the defendants were not seized because it was "readily apparent" that the officer did not actually block the defendants' exit from the parking lot, and because the rest of the officer's actions, like parking his vehicle in a parking space and approaching the truck on foot, reflected a routine encounter. *Id.*

Here, the district court found that Williams could have exited either to his left or to his right[4] but, despite the emphasis on maneuvering in *Jones* and *Watkins*, did not make any findings regarding what kind of maneuvering Williams would have had to make in order to leave.

Even construing the facts in the Government's favor, the evidence shows that it was not "readily apparent" that there was "more than enough room" for Williams to drive away without any "special maneuvering." *Watkins*, 816 F. App'x at 828–29. Pistone testified that he parked relatively close to—approximately fifteen feet away—and partially in front of Williams' car. J.A. 140; J.A. 145. Williams' car, a Mercedes E350, is 16.25 feet long and 6.75 feet wide.[5] The photos above show that to exit to his left Williams would have

---

[4] Williams disputes that he could have physically left and argues that the district court erred when it found that there was room for Williams to leave the parking space on either side. We need not resolve that issue because, even assuming he could have physically left, we ultimately conclude that Williams was seized.

[5] *Used 2021 Mercedes-Benz E350 – Specs & Features*, EDMUNDS, https://www.edmunds.com/mercedes-benz/e-class/2021/st-401844177/features-specs/?msockid=14d09f39868e6d6019e0882a871a6cfa [https://perma.cc/3RLY-DMSP].

had to drive towards Pistone's police vehicle. And considering the length and width of his car and the position of the other vehicles in the parking area, Williams would have had to maneuver in close proximity to both Pistone's vehicle and the white car parked to his left, potentially risking a collision. The spacing between the vehicles was so limited that Williams may have needed to perform a multipoint turn to clear the space. Exiting to his right presented similar obstacles. Williams again would have had to drive towards Pistone's police vehicle and maneuver in close proximity to both Pistone's police vehicle and the brown car parked to his right, again risking a collision or requiring a multipoint turn. Additionally, exiting to the right would require Williams to drive by Wilson's police vehicle, which was parked in the middle of the roadway. Both of Williams' exit options contrast with the defendants' ability to maneuver in *Watkins*, where the truck could pull out if its parking space away from the police vehicle and proceed past it on the opposite side of the driving lane. Accordingly, we hold that Williams, like the defendant in *Jones*, was "blocked in" because a reasonable person would not have felt free to attempt his available means to exit. *See Jones*, 678 F.3d at n.4.

In addition to being blocked in, the officers' conduct would suggest to a reasonable person in Williams' position that he was the subject of an investigation and not free to leave. The police arrived in two separate marked police cars. Although the officers were not speeding as they approached, a person in Williams' position would have seen them arriving from the right and would have also seen how quickly they stopped their vehicles. They stopped their cars in the middle of the roadway instead of against the curb or in one of the nearby available parking spaces. Pistone parked in the roadway at least partially in

14

front of Williams' car, and Wilson parked in the roadway just behind Pistone. The act of parking in the roadway in front of a vehicle parked in a delineated parking space necessarily suggests an obstructive motive because it is inconsistent with how parking lots are "routinely used." *Cf. O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011) (noting that "parking behind a vehicle in a driveway does not inherently send a message of seizure because it is how driveways are routinely used"). Parking perpendicular to Williams' car in the middle roadway inherently sent a message of seizure to Williams. This is especially true because there were several open parking spaces that the officers could have used. Each of these factors would indicate to a reasonable person that he was the subject of police investigation and therefore not free to leave.

The Government relies on the black Ford Fiesta's departure from its parking space to argue both that Williams was not blocked in and that a reasonable person in Williams' position would have felt free to leave, but that comparison is inapposite for two reasons.

First, the black Ford Fiesta was not similarly situated to Williams' vehicle. The black Ford Fiesta was smaller than Williams' Mercedes E-class sedan and therefore more capable of maneuvering out of its parking space and by Wilson's police vehicle.[6] And unlike Williams' vehicle, which was parked between two cars, the black Ford Fiesta had

---

[6] A Ford Fiesta is 13.33 feet long and 5.66 feet wide. *Used 2019 Ford Fiesta – Specs & Features*, EDMUNDS, https://www.edmunds.com/ford/fiesta/2019/features-specs/?msockid=14d09f39868e6d6019e0882a871a6cfa [https://perma.cc/5ACF-9GZT]. A Mercedes E350 is 16.25 feet long and 6.75 feet wide. *Used 2021 Mercedes-Benz E350 – Specs & Features*, EDMUNDS, https://www.edmunds.com/mercedes-benz/e-class/2021/st-401844177/features-specs/?msockid=14d09f39868e6d6019e0882a871a6cfa [https://perma.cc/3RLY-DMSP].

15

space on both sides. As a result, it could exit its parking space without undertaking special maneuvers. Therefore, the black Ford Fiesta's ability to leave does not establish that Williams' vehicle was not effectively blocked in.

Second, the black Ford Fiesta's departure does not inform whether a reasonable person in Williams' position would have felt free to leave. The black Ford Fiesta did not drive away until after Williams was placed in the back seat of a police vehicle. By that point, the officers were focused on apprehending Williams, signaling to others in the parking lot that they were not the subject of police attention. Indeed, the officers approached and questioned only the occupants of Williams' vehicle. This selective conduct would have indicated to a reasonable person in any other parking space that they were not under investigation and were therefore free to leave. By contrast, a reasonable person in Williams' position would not have felt free to leave before the officers exited their vehicles as he would have had no reason to believe the police presence was directed at anyone other than himself.

Accordingly, we conclude that Williams was seized when the officers stopped their cars in the roadway.

B.

Because Williams was subject to a Fourth Amendment seizure, we continue to the second question: whether the information available to the officers provided reasonable suspicion to justify the seizure.

The Fourth Amendment permits brief investigatory seizures when a law enforcement officer has reasonable suspicion of criminal activity. *See Bostick*, 501 U.S. at

434. The "reasonable suspicion" necessary to justify a seizure "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

Courts consider the totality of the circumstances in assessing whether the officer had a particularized and objective basis for suspecting criminal activity. *United States v. Foster*, 824 F.3d 84, 88–89 (4th Cir. 2016). The "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. "Seemingly innocent factors, when viewed together, can amount to reasonable suspicion." *Foster*, 824 F.3d at 89. But courts should be "skeptical of [g]overnment attempts to spin . . . largely mundane acts into a web of deception." *Id.* (internal citations omitted). "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

The court's inquiry "must account for the 'totality of the circumstances,' rather than employ a 'divide-and-conquer analysis.' " *United States v. Williams*, 808 F.3d 238, 247 (4th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). But in considering whether the factors articulated by a police officer amount to reasonable suspicion, the court may "separately address each of the[] factors before evaluating them together with the other circumstances of the [seizure]." *United States v. Powell*, 666 F.3d 180, 187–88 (4th Cir. 2011); *see, e.g., United States v. Bowman*, 884 F.3d 200, 214–18 (4th Cir. 2018) (considering each factor alone before considering the factors together with the totality of the circumstances).

17

The Government argues that the officers had reasonable suspicion to seize Williams based on the anonymous 911 call and the presence in a high crime area. We address both factors separately in sections III.B.1–2 before evaluating them together in Section III.B.3.

1.

Anonymous tips "are generally less reliable than tips from known informants and can form the basis of reasonable suspicion only if accompanied by specific indicia of reliability." *Florida v. J.L.*, 529 U.S. 266, 269 (2000). Such indicia may include firsthand observation of criminal activity, a report that is roughly contemporaneous with the observed criminal activity, reports of an ongoing emergency, and use of the 911 emergency system. *See Navarette v. California*, 572 U.S. 393, 399–401 (2014). Reliability may also be strengthened when police corroborate certain details of the anonymous tip. *See White*, 496 U.S. at 331.

That said, an anonymous tip supports reasonable suspicion only if police corroborate details connected to the alleged criminal activity. *See J.L.*, 529 U.S. at 272 (2000). For example, in *Alabama v. White*, the tipster's accurate prediction of future behavior suggested "a special familiarity with [the suspect's] affairs," which in turn implied that the tipster had "access to reliable information about that individual's illegal activities." 496 U.S. at 332. Conversely, a tip that merely identifies a specific person without providing the police with means to corroborate the accusation of wrongdoing does not bear sufficient indicia of reliability. *J.L.*, 529 U.S. at 272.

In *Florida v. J.L.*, the Supreme Court held that an anonymous tip was insufficient to justify an investigatory stop. *Id.* at 271–74. In that case, the police received a call from

18

an unidentified person, calling from an unidentified location, and reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Police officers responded to the bus stop and found three Black males, one of whom was wearing a plaid shirt. *Id.* Based on the anonymous tip, one of the officers approached J.L., told him to put his hands up, frisked him, and seized a gun from his pocket. *Id.* The Court held that the officers lacked reasonable suspicion because the tip "provided no predictive information" that would have allowed the officers "to test the informant's knowledge or credibility" about crime that may be afoot. *Id.* at 271. While the anonymous tip of course provided an accurate description of J.L.'s location and appearance, such "readily observable" details showed nothing about the tipster's "knowledge of concealed criminal activity." *Id.* at 272. Reasonable suspicion, the Court emphasized, "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* Accordingly, the tip lacked sufficient indicia of reliability to provide the officers with reasonable suspicion for their investigatory stop. *Id.* at 274.

Like the tip in *J.L.*, the anonymous tip here contained no information allowing the officers to test or corroborate the alleged criminal activity and instead consisted only of readily observable identifying details. The officers here only received information through their CAD systems, which showed the 911 caller's phone number and instructed the officers to "check for" "bro skinned, lt skinned, male with braids" "sitting in whi merz sedan" "same appears to be making drug transactions" "currently near the pool area." J.A. 59. Like the tip in *J.L.*, the CAD report "provided no predictive information" whatsoever. *J.L.*, 529 U.S. at 271. The CAD report did not suggest when any alleged transaction would

19

occur, with whom, or under what circumstances. It did not mention future movements, planned behavior, or any basis for concluding that the tipster had actually seen a drug transaction. In no way did the CAD report allow the officers "to test the informant's knowledge or credibility" about the alleged crime. *Id.* Nor did it show that the tipster had a "special familiarity" with Williams' affairs to suggest that the tipster had "access to reliable information about . . . [Williams'] illegal activities." *White*, 496 U.S. at 332. Instead, the content of the CAD report consisted primarily of "readily observable" facts, like the appearance and location of Williams and his car, that any passerby could have reported. *J.L.*, 529 U.S. at 272. As the Supreme Court made clear in *J.L.*, such a tip "does not show that the tipster ha[d] knowledge of concealed criminal activity," and therefore cannot establish reliability in the assertion of illegality. *Id.* at 272.

The Government's primary response is to invoke *Navarette v. California*, arguing that the use of the 911 system renders the anonymous tip reliable, but *Navarette* involved far more than a call to 911.

In *Navarette,* the Supreme Court held—in a "close case"—that an anonymous tip provided officers with reasonable suspicion that a driver was intoxicated. 572 U.S. at 399–401. There, a 911 dispatcher received a tip from an anonymous caller who reported that a pickup truck had just run her vehicle off the road. *Id.* at 395. The 911 dispatcher relayed the tip to the officers as follows: " 'Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8-David-294925. Ran the reporting party off the roadway and was last seen approximately five [minutes] ago.' " *Id.* Two officers found the truck and followed it for five minutes. *See id.* The officers stopped the truck even though they

20

did not see the driver make any driving errors. *Id.* When they approached the truck, the officers smelled marijuana and discovered marijuana in the bed of the truck. *Id.*

The driver and passenger of the truck moved to suppress the evidence from the traffic stop, arguing that the stop violated the Fourth Amendment because it was based solely on an anonymous tip and the officers lacked reasonable suspicion of criminal activity. *Id.* at 396. Because the anonymous caller provided details about the vehicle's make, model, color, and license plate; made the call to 911 (which allows for identifying and tracing callers and could subject the caller to prosecution if she made a false report); and was "under the stress of excitement caused by a startling event" (making the call less likely to be preplanned), the Supreme Court found the tip reliable. *Id.* The Court then emphasized the dangers of drunk driving and how certain behaviors are "sound indicia" that a driver might be intoxicated. *See id.* at 400, 403–04. Considering those dangers as part of the "totality of the circumstances," the Court held that "the indicia of reliability in this case [was] sufficient to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road." *Id.* at 404.

When holding the anonymous tip provided the officers with reasonable suspicion, the Court stressed the dangerousness of the situation. *See id.* at 398–404. The Court noted that the 911 caller "reported more than a minor traffic infraction" and instead "alleged a specific and dangerous result of the driver's conduct: running another car off the highway." *Id.* at 403. To the Court, "[t]hat conduct b[ore] too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness." *Id.* The Court also distinguished other uncorroborated traffic tips from tips suggesting

drunk or reckless driving, stating "[u]nconfirmed reports of driving without a seatbelt or slightly over the speed limit, for example, are so tenuously connected to drunk driving that a stop on those grounds alone would be constitutionally suspect." *Id.* at 402. On the other hand, the Court stated, "a reliable tip alleging the dangerous behaviors discussed above generally would justify a traffic stop on suspicion of drunk driving." *Id.* In closing, the Court found "[e]xtended observation" inappropriate in this context and warned of the "disastrous consequences" that could result if officers "allow[ed] a drunk driver a second chance." *See id.* at 403–04.[7]

Contrary to the Government's contention, the circumstances here are unlike *Navarette* because they did not involve a dangerous, urgent, or fleeting situation that would justify immediate police intervention. The CAD report did not indicate a dangerous situation; rather it reported that occupants in a vehicle "appeared" to be making drug transactions and noted that no weapons were seen. J.A. 59. The call was classified as "Priority Normal," a non-emergency designation. *Id.* Indeed, the officers responded in a nonemergent fashion, reporting to the apartment complex at normal speeds and without

---

[7] The dissent in *Navarette* also implied that the dangers of drunk driving moved the Court. *Navarette*, 572 U.S. at 414 (Scalia, J., dissenting) ("Drunk[] driving is a serious matter, but so is the loss of our freedom to come and go as we please without police interference. To prevent and detect murder we do not allow searches without probable cause or targeted *Terry* stops without reasonable suspicion. We should not do so for drunken driving either."). Other courts have also acknowledged that an important factor in *Navarette* was the ongoing emergency situation. *See United States v. Edwards*, 761 F.3d 977, 984 (9th Cir. 2014) (finding reliable an anonymous 911 tip from an eyewitness reporting an ongoing and dangerous situation); *see also United States v. White*, 681 F. App'x. 603, 604 (9th Cir. 2017) (finding an anonymous 911 tip unreliable because it did not describe " 'conduct that bears great resemblance to paradigmatic manifestations of' an ongoing and dangerous criminal activity." (quoting *Navarette*, 572 U.S. at 403)).

sirens or lights. Pistone even testified that he would have let Williams drive away before opening his car door, underscoring the absence of urgency. J.A. 143. Additionally, the anonymous tip did not present the kind of fleeting scenario at issue in *Navarette*, where officers had limited opportunity to corroborate illegality before acting. Here, by contrast, the officers could have tried to corroborate the suspected drug activity through a consensual encounter or by surveilling Williams and the other occupants of the Mercedes. Unlike in *Navarette*, "extended observation" would have been appropriate under these circumstances.

And aside from the fact that the call reporting Williams was made through the 911 system, this case lacks the other indicia of reliability that supported the tip in *Navarette*. The caller in *Navarette* provided a contemporaneous report of a specific, startling event, suggesting firsthand observation. *See* 572 U.S. at 399; *see also id.* at 400 (holding that "contemporaneous report[ing] has long been treated as especially reliable"). The tip here, by contrast, offered no such detail. It did not describe any specific, observable conduct indicative of drug transactions, such as individuals approaching the vehicle and exchanging items. Instead, the CAD report offered only a vague assertion of suspected wrongdoing, unsupported by predictive information or any meaningful basis of knowledge of what the occupants of the car were actually doing. That kind of accusation, untethered to details of illegal activity or predictive information, provides no objective basis for reasonable suspicion that criminal activity was actually occurring. The Government's reliance on *Navarette* is therefore misplaced.

23

The Supreme Court's decisions in *White*, *J.L.*, and *Navarette* establish a clear framework for evaluating anonymous tips. An anonymous tip cannot support reasonable suspicion unless it provides some reliable basis to believe the allegation of criminal activity, such as predictive information, *White* 496 U.S. at 33, or details that suggest firsthand observation of criminal activity, *Navarette*, 572 U.S. at 399. The use of the 911 system, standing alone, does not establish reliability, as *Navarette* recognized several other indicia, such as contemporaneous firsthand observations of criminal activity and observations made under the stress of excitement caused by a startling event. *Id.* Where those additional features are absent, a 911 tip is not much more reliable than other anonymous tips based on readily observable facts.

Under this framework, the tip here was unreliable because it lacked predictive information, details to suggest firsthand observation of criminal activity, or any indication of urgency. The tip therefore deserves little weight in the totality of the circumstances. Holding otherwise would allow officers to seize individuals based on nothing more than a vague accusation relayed through 911.

## 2.

Presence in a "high-crime area" is a relevant contextual consideration but cannot alone create reasonable suspicion of criminal activity. *See United States v. Curry*, 965 F.3d 313, 330–31 (4th Cir. 2020) (en banc). The court has reasoned that "presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry." *United States v. Massenburg*, 654 F.3d 480, 488 (4th Cir. 2011) (internal quotation marks omitted) (quoting *Illinois v. Wardlaw*, 528 U.S. 119,

24

139 (2000)); *accord United States v. Hawkins*, 161 F.4th 242, 247 (4th Cir. 2025) (stating that presence in a high-crime area is a "weak and generic factor" when considered to support reasonable suspicion).

Based on this court's prior pronouncements regarding presence in a high-crime area, the fact that the events here took place in an area known to the officers for crime deserves little weight in the totality of the circumstances.

3.

Even though neither of the factors above independently provide a basis for a reasonable, articulable suspicion that Williams was engaged in criminal activity, we still must consider all the factors together. *Bowman*, 884 F.3d at 218; *United States v. Drakeford*, 992 F.2d 255, 263 (4th Cir. 2021). The "court 'must look at the cumulative information available to the officer,' rather than hold a '[seizure] unjustified based merely on a piecemeal refutation of each individual fact and inference.' " *Id.* at 218 (quoting *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008)). To find reasonable suspicion based on a combination of innocent factors, the Government must identify specific reasons to suspect criminal activity. *Bowman*, 884 F.3d at 218–19.

Even combining all the factors identified by the Government, we find that there was not reasonable suspicion that Williams was engaged in criminal activity. The officers lacked specific indicators linking Williams or the other occupants of the Mercedes to drug dealing. Before arriving at the apartment complex, the officers only possessed the information on the CAD report, which indicated the occupants of the Mercedes "appear[] to be making drug transactions." J.A. 59. Even if the report was reliable, such a vague

25

allegation is insufficient to provide a particularized and objective basis for a seizure. The CAD report did not describe any specific suspicious behavior, like a hand-to-hand transaction. *See United States v. Hawkins*, 161 F.4th 242, 247 (4th Cir. 2025) (concluding that officers did not have reasonable suspicion that a drug transaction had taken place when there were no "specific identifiers" like a handshake or items changing hands). Moreover, the alleged drug activity here occurred during the day and in a public setting, which is not indicative of criminal activity. *See id.* at 249 (discounting an interaction for purposes of reasonable suspicion partly because the interaction "took place in the middle of the afternoon, in broad daylight, and in a public place"). Although the area was known for criminal activity, that fact adds little weight towards a finding of reasonable suspicion.

Moreover, the Government presents a weaker case for reasonable suspicion here than the government in *Drakeford*, *Bowman*, and *Hawkins*, three cases where the court found the officers lacked reasonable suspicion. In *Drakeford*, the government argued there was reasonable suspicion based on "(1) a confidential informant [that] provided information that [the defendant] trafficked cocaine and heroin; (2) officers witness[ing] what they believed to be a drug transaction in a gas station parking lot" where a person exited their car and sat in the defendant's car for 30 to 45 seconds before returning to their car; (3) officers finding syringes in the car of the person who entered the defendant's car; (4) "officers witness[ing] [the defendant] arrive at a second gas station and wait in his car; [(5)] officers witness[ing] [the defendant] enter a home empty handed, leave carrying bags, and subsequently inform the confidential informant that he had drugs to sell; and [(6)] [an officer] believe[ing] he witnessed a 'hand-to-hand' [drug] transaction when [the defendant]

26

engaged in a second handshake in [a] . . . parking lot." *Drakeford*, 992 F.3d at 263. In *Bowman*, the government argued there was reasonable suspicion based on (1) "[the defendant's] apparent nervousness"; (2) "the presence of a suitcase, clothes, food, and an energy drink inside of the [car]"; (3) "[the defendant's] inability to supply [the officer] with the [requested] name and address"; and (4) "statements that [the defendant] had been laid off recently and that he had recently purchased the" car he was driving. *Bowman*, 994 F.3d at 215. In *Hawkins*, the government argued there was reasonable suspicion based on (1) presence in a high crime area; (2) the driver's prior drug conviction; (3) an interaction between a third party and the occupants of the vehicle, where the third party, who was known from prior drug investigations, leaned into the car to speak with the occupants; and (4) inconsistent statements from the occupants of the vehicle when questioned separately roadside. *Hawkins*, 161 F.4th at 248. All three of those cases presented more suspicious circumstances than the facts here, yet the court still found the officers lacked reasonable suspicion.

Accordingly, the facts taken together failed to create reasonable suspicion sufficient to lawfully seize Williams.[8]

---

[8] Pistone testified that when he received the call for service he intended to "arrive look for the vehicle or subjects described in the call for service and make voluntary contact with them." J.A. 120–21. Pistone further testified that he would have let Williams leave the parking lot before he opened his vehicle door and smelled the odor of marijuana. J.A. 143. This testimony suggests that even Pistone himself did not believe he had a reasonable basis to suspect that Williams was engaged in criminal activity to effectuate the seizure.

IV.

For the above reasons, we reverse the district court's denial of Williams' motion to suppress, vacate his conviction, and remand the case for further proceedings consistent with this opinion.

*REVERSED, VACATED, AND REMANDED*

RUSHING, Circuit Judge, dissenting:

After an evidentiary hearing, the district court concluded that Officers Pistone and Wilson did not seize Williams during the two seconds between when the Officers parked their vehicles near Williams's car and when they opened their doors and smelled the marijuana Williams had been smoking. I would affirm that well-supported conclusion. Because the majority holds otherwise, I respectfully dissent.

For Fourth Amendment purposes, a "seizure" occurs when an officer, by "physical force or show of authority," in some way "restrain[s] the liberty" of a person. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). Law enforcement officers do not effectuate a seizure "merely by approaching individuals on the street or in other public places and putting questions to them." *United States v. Drayton*, 536 U.S. 194, 200 (2002). "So long as a reasonable person would feel free to disregard the police and go about his business," the Fourth Amendment is not implicated. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotation marks omitted). Rather, a person is "seized" if, under the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013). Factors this Court considers as part of the totality of the circumstances include, but are not limited to:

> [T]he number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of illegal activity rather than treating the encounter as routine in nature.

29

*United States v. Jones*, 678 F.3d 293, 299–300 (4th Cir. 2012) (internal quotation marks omitted).

Here, the Officers had probable cause to search Williams's car as soon as Officer Pistone opened the door of his patrol vehicle and smelled marijuana; therefore, whether an unreasonable seizure occurred turns solely on how the Officers approached the parking lot and parked their police cruisers. Viewing the totality of the circumstances and construing the facts in the light most favorable to the Government, as we must, *see United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010), no seizure occurred. It is undisputed that the Officers arrived in two marked vehicles without engaging their blue lights or sirens. They were not driving at high speeds and proceeded through the residential area as any other vehicle might, with their vehicles slowing substantially in the final stretch of roadway before coming to a stop. The Officers had not followed Williams into the parking lot but rather arrived at the apartment complex and stopped in the parking lot roadway "seemingly at random." *Jones*, 678 F.3d at 300. By all appearances, this was "a routine encounter" with officers on patrol. *Id.* at 301. Nothing in the Officers' approach indicated that they were "target[ing]" Williams, or for that matter, anyone else in the parking lot or apartment complex. *Id.*

Williams focuses almost exclusively on the positioning of the patrol vehicles in relation to his parked car, insisting that they blocked his exit. The district court, however, found that Williams had "room to drive out, both to the left and to the right." J.A. 171. The court's finding that "there was room to drive out" indicates that Williams could have taken the simple action of putting the car into drive and exiting the parking space in normal

30

fashion for a parking lot, which typically occurs in close proximity to other vehicles and at low speed.

The district court's factual finding was not clearly erroneous. *See United States v. Norman*, 935 F.3d 232, 236 (4th Cir. 2019) (standard of review). That finding is confirmed by body-worn camera footage and the testimony of Officer Pistone, who the district court found "credible" and who was present in the parking lot and observed the vehicles firsthand. J.A. 171. The body-worn camera footage shows room through which Williams's white Mercedes could have turned out of the spot it was backed into in the same manner as the nearby black Ford Fiesta later did. Officer Pistone's cruiser was pulled beyond the Mercedes, only partially blocking its path if it had pulled straight out. Although turning out to the left would have been a tighter fit, the gap between the police vehicles created plenty of turning room for the front-left corner of the Mercedes in an exit to the right, and there were several feet of room on both sides of the Mercedes, as shown below. Any maneuvering that Williams would have had to perform to exit the parking space was no greater than the normal maneuvers that people commonly must perform in everyday parking scenarios. The district court did not clearly err in finding that Williams had "room to drive out." J.A. 171.

31



Digital Ex. 2, at 0:34.



Digital Ex. 1, at 3:31.

This situation is unlike that in *Jones*.  There, an officer followed the defendant into

a parking lot and parked his patrol car in a one-lane driveway, which had diagonal parking

32

spots to one side. To leave his parking spot, the defendant would have had to back his vehicle out of the parking spot and back down the one-way driveway going in the wrong direction. 678 F.3d at 297. By contrast, here the Officers parked in a two-lane driveway with room for Williams's vehicle to leave to the left or to the right. The Officers did not block Williams's exit or create a situation where he would have to attempt unreasonable and extraordinary efforts to exit—he just had to "drive out." J.A. 171. Nor did the Officers follow Williams to that location. *Cf. Jones*, 678 F.3d at 296. Instead, Williams had been sitting in the parking lot for at least fifteen minutes between the concerned citizen calling 911 and the Officers arriving.

Moreover, the location of the patrol vehicles did not constitute a liberty-restraining show of authority against anyone, much less Williams in particular. The Officers parked in the two-lane roadway adjacent to an apartment building, leaving the subject of their visit unclear. They did not single out Williams by parking directly in front of, or flanking both sides of, his vehicle specifically. The Officers could have been responding to a call from one of the apartment buildings or to a call about any of the five cars parked in the row near the police cruisers—perhaps a reported vehicle break-in, for example. While Williams and the majority place dispositive emphasis on the Officers' parking job, the location of the police cruisers did not communicate to any reasonable person in the parking lot or the apartment complex that they were not free to go about their business. *See Bostick*, 501 U.S. at 434.

In reaching a different conclusion, the majority appears to adopt a new legal standard. The majority reasons that officers *have* seized a car and its occupants *unless* it is

33

"'readily apparent' that there [is] 'more than enough room' . . . to drive away without any 'special maneuvering.'" Maj. Op. 13 (quoting *United States v. Watkins*, 816 Fed. App. 821, 827–828 (4th Cir. 2020)). It is not sufficient, apparently, that a reasonable person would feel free to drive away, or that he could drive away without any special maneuvering. Nor is it sufficient even that a reasonable person had enough room to drive away without special maneuvering—he must have "more than enough room." But even that does not suffice. Rather, officers must make it "readily apparent" that all of this is the case.

*Watkins*, the unpublished case on which the majority relies, does not stand for that proposition. In *Watkins*, the Court found no seizure because it was readily apparent there was more than enough room for the vehicle to exit, contrary to the defendants' arguments about maneuvering. *See* 816 Fed. App. at 825–828. But it does not follow that the facts *sufficient* to show the absence of a seizure in *Watkins* are *necessary* to prove the absence of a seizure here, or in any other case. By turning *Watkins*'s facts into a legal standard, the majority commits the logical fallacy of confusing sufficient conditions with necessary ones.

Construed in the light most favorable to the Government, the facts confirm the district court's conclusion that, at the time of the Officers' arrival, a reasonable person in Williams's situation would consider himself free to leave the parking lot unconstrained by any individualized show of police authority. Accordingly, the district court correctly denied Williams's motion to suppress. Because the majority concludes otherwise, I respectfully dissent.

34